ANDREW HADEN
Acting United States Attorney
MELANIE K. PIERSON
Assistant United States Attorney
California State Bar No. 112520
United States Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101-8893
Telephone: (619) 546-7976/Fax: (619) 546-0631
Email: melanie.pierson@usdoj.gov

TODD KIM
Assistant Attorney General
STEPHEN DA PONTE
Senior Trial Attorney
Florida Bar No. 58454
150 M Street, N.E.
Washington, D.C. 20002
Telephone: (202) 305-2729
Email: Stephen.DaPonte@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>ZEABORN SHIP MANAGEMENT (SINGAPORE) PTE. LTD. (1), ALEXANDER PARRENO (2), and CONSTANCIO ESTUYE (3),<br><br>    Defendants. | Criminal Case No. 23-CR-1661-JO<br>Date:   September 13, 2023<br>Time:   1:30 p.m.<br><br>The Hon. Jinsook Ohta<br><br>**GOVERNMENT'S SENTENCING MEMORANDUM** |

COMES NOW plaintiff, the UNITED STATES OF AMERICA, through its counsel, Andrew Haden, Acting United States Attorney, Melanie K. Pierson, Assistant United States Attorney, Todd Kim, Assistant Attorney General, and Stephen Da Ponte, Senior Trial Attorney, and hereby files its Sentencing Memorandum. This memorandum and motion is based on the files and records of this case, and the points and authorities below.

# I

# STATEMENT OF THE CASE

On August 21, 2023, defendants Zeaborn Ship Management PTE. LTD. ("Zeaborn"), Alexander Parreno, and Constancio Estuye entered their pleas of guilty to an Information charging them with one count of knowingly failing to maintain an accurate Garbage Record Book (Zeaborn and Parreno) and one count of knowingly failing to maintain an accurate Oil Record Book (Zeaborn and Estuye) for the vessel *Star Maia*. Specifically, defendants Zeaborn and Alexander Parreno maintained a Garbage Record Book that: (1) failed to record the burning of garbage in barrels on the vessel's deck; and (2) failed to record the disposal of burned garbage and barrels into the ocean; all in violation of Title 33, United States Code, Section 1908(a), and Title 33, Code of Federal Regulations, Section 151.55. Defendants Zeaborn and Constancio Estuye maintained and caused to be maintained an Oil Record Book that: (1) failed to record the discharges of oily bilge water from the Bilge Holding Tank and the Clean Bilge Tank into the ocean; and (2) erroneously recorded that oily bilge water had been discharged using the OWS when, in fact, the OWS had not been used. All in violation of Title 33, United States Code, Section 1908(a); Title 33, Code of Federal Regulations, Section 151.25; and Title 18 United States Code, Section 2. The defendants are now before the Court for sentencing.

# II

# SENTENCING CONSIDERATIONS

Section 3553(a) of Title 18 of the United States Code sets forth the factors that the court must consider when imposing sentence. These factors will be addressed herein, in discussing how the government arrived at its sentencing recommendation.

//
//

A.   **<u>The Nature And Circumstances Of The Offense And History And Characteristics Of Defendants</u>**

Defendant Zeaborn is a company domiciled in Singapore with offices at 1 Maritime Square, #11-03 Harbour Front Centre, Singapore 099253. At all relevant times, Zeaborn served as the operator of the commercial vessel *Star Maia*. Defendant Alexander Parreno is a Filipino citizen and licensed to serve as the "Master" or "Captain" onboard commercial vessels. As part of the licensing requirements to be a Master, Parreno has a college degree and has received training in marine environmental protection requirements, and has many years of practical experience working as a marine officer. Defendant Constancio Estuye is a Filipino citizen and licensed to serve as the "Chief Engineer" onboard commercial vessels. As part of the licensing requirements to be a Chief Engineer, Estuye has a college degree in marine engineering, has received training in marine environmental protection requirements, and has many years of practical experience working as an engineer.

Prior to the *Star Maia's* arrival at the Port of San Diego, the U.S. Coast Guard received a report claiming that crew members in the engine room had discharged oily bilge water directly overboard into the ocean, and that garbage had been burned in barrels onboard the vessel. When the *Star Maia* arrived at the Port of San Diego on October 14, 2022, the U.S. Coast Guard conducted an inspection of the vessel. During the inspection, the U.S. Coast Guard obtained evidence establishing that several overboard discharges of oily bilge water had been conducted without using the required pollution prevention equipment, and that these discharges had not been recorded in the vessel's Oil Record Book as required by law. Additionally, the U.S. Coast Guard obtained evidence that on several occasions, garbage (including paper, plastics, and oily rags) had been burned in barrels on the deck of the vessel and these barrels had been subsequently thrown into the ocean. Neither the burning of garbage on deck nor the disposal of barrels overboard at sea were recorded in the vessel's Garbage Record Book as required by law.

When Defendant Parreno came onboard the *Star Maia* on May 18, 2022, the vessel had recently completed maintenance in drydock, and he noticed an unusual accumulation of garbage. Rather than storing the garbage onboard until it could be offloaded to a reception facility or incinerating it in the vessel's incinerator, Defendant Parreno instead directed the crew to burn certain garbage in barrels onboard the vessel. This garbage burning took place on at least 3 or 4 occasions between June and August 2022. The type of garbage burned included paper, plastics, and oily rags. After the burning was complete, a crew member threw the barrels used to burn the garbage into the ocean.

On or about August 26, 2022, Defendant Parreno became aware that oily bilge water from the engine room had been discharged directly overboard and these discharges were not recorded in the vessel's Oil Record Book. Specifically, in preparation for the *Star Maia's* port call in San Diego, California, Defendant Parreno instructed the vessel's Chief Engineer, Defendant Estuye, to follow a shipboard checklist to inspect the vessel's pollution prevention equipment, to include the Oil Water Separator and Oil Content Monitor (which keeps an electronic record of when the system is operated), and the vessel's Oil Record Book to ensure there were no discrepancies. This inspection revealed that the Oil Water Separator had not been used since May 2022, despite three entries in the Oil Record Book (June 17, 2022, July 9, 2022, and July 29, 2022) made by the crew claiming that the system had been used. In all, these three Oil Record Book entries falsely recorded a total of approximately 6,762 gallons of oily bilge water having been processed through the Oil Water Separator when this oily bilge water had in fact been discharged directly overboard into the ocean.[1]

---

[1] The United States is part of an international regime that regulates the discharges of oil from vessels at sea known as the International Convention for the Prevention of Pollution from Ships, as modified by the Protocol of 1978 ("MARPOL"). MARPOL was enacted into United States law by the Act to Prevent Pollution from Ships (APPS). 33 U.S.C. § 1901, et seq. APPS and its regulations apply to foreign-flagged vessels like the Star Maia while they are operating in United States waters or at a port or terminal under the jurisdiction of the United States. 33 C.F.R. § 151.09(a)(5). To facilitate enforcement, the USCG is empowered under 14 U.S.C. § 522(a) to board vessels and conduct inspections and investigations of potential violations of international and United States law, including MARPOL and APPS. The USCG is specifically authorized to examine the vessel and vessel's required record books to determine, among other things, whether the vessel has operable

The shipboard investigation performed by Defendant Parreno before the vessel arrived in the U.S. determined that the Second Engineer had been bypassing the vessel's Oil Water Separator and discharging oily bilge water from the bilge water holding tank directly into the ocean by opening valve BL-15 and using the general service pump. Defenant Parreno reported this situation to a shoreside Superintendent of Defendant Zeaborn. Zeaborn's Superintendent immediately told Defendant Parreno to fire the Second Engineer and remove him from the vessel at the next scheduled port call in Panama which was the port before the vessel reached San Diego. Zeaborn's Superintendent also arranged for an auditor to meet the vessel in Panama to assist the crew in preparing for the vessel's scheduled arrival in San Diego and anticipated U.S. Coast Guard inspection. This auditor was a third-party service provider appointed by Defendant Zeaborn.

On or about September 30, 2022, this third-party auditor attended the *Star Maia* in Balboa, Panama, for a period of approximately three days. Defendants Parreno and Estuye both asked the auditor if entries should be made to the Oil Record Book to correct the false entries that had been previously made (claiming the Oil Water Separator had been used when it had not). The auditor advised not to make any corrections to the Oil Record Book

---

pollution prevention equipment and appropriate operating procedures; whether it poses any danger to United States' ports and waters; and whether the vessel has discharged any garbage, oil, or oily mixture in violation of MARPOL, APPS, or any applicable federal regulations. 33 C.F.R. § 151.23(a)(3) and (c). The operations of large marine vessels like the Star Maia generate oily bilge water created when water mixes in the bottom of the vessel, known as the "bilges," with oil that has leaked and dripped from the machinery and the lubrication and fuel system for the engines. These "oily mixtures" are collected, stored, and processed to separate the water from the oil and other wastes using a pollution prevention control device known as an Oily Water Separator ("OWS") and an oil-sensing device known as an Oil Content Monitor ("OCM"). Pursuant to MARPOL, oily bilge water may only be discharged overboard after passing through an OWS to ensure that it contains 15 parts per million ("ppm") or less of oil, as measured by the OCM. MARPOL and APPS regulations require that vessels with a weight of more than 400 gross tons, such as the *Star Maia*, maintain a record known as an Oil Record Book ("ORB"). The ORB must fully recordall operations involving the discharge overboard and disposal of bilge water that has accumulated in machinery spaces, and thus may be contaminated with oil. 33 C.F.R. § 151.25(d) and (h); MARPOL, Annex I Regulation 17 and Appendix III (Form of ORB). Consistent with the requirements contained in MARPOL Annex V, APPS regulations also require that the master or person in charge of each vessel of more than 400 gross tons maintain a record known as a Garbage Record Book ("GRB") in which the discharge overboard and discharge to shore of garbage must be recorded, including the date and time, volume and, if discharged at sea, the latitude and longitude. 33 C.F.R. § 151.55(a) and (b). Entries in the GRB must be made at the time of the operation, certified as correct by the master or person in charge of the ship, maintained on the ship for two years following the operation, and made available for inspection by the U.S. Coast Guard. 33 C.F.R. § 151.55(f); MARPOL, Annex V Regulation 10 and Appendix II (Form of GRB).

because he thought the U.S. Coast Guard would not be interested in the discrepancies and instead advised that the discrepancies be reported to Defendant Zeaborn as non-conformities in accordance with the company's internal procedures. Defendant Parreno also asked if the investigation report and explanation of the termination of the Second Engineer should be attached to the Oil Record Book to explain the discrepancies and the auditor advised Defendant Parreno not to include a letter or make any corrective entries because the U.S. Coast Guard would not be interested in discrepancies going back four months in time.

After the *Star Maia* departed Balboa, Panama, and was headed to San Diego, California, Defendant Estuye ordered a lower-ranking crew member to discharge oily bilge water from the Clean Bilge Tank directly into the ocean using the general service pump, bypassing the Oil Water Separator.[2] This lower-ranking crew member refused to follow this order, so Defendant Estuye directed a second lower-ranking crew member to do it. This second crew member initially refused, but Defendant Estuye told him that he (Defendant Estuye) would stand lookout on the deck of the vessel and would radio the crew member to stop discharging if he saw any visible traces of oil discharge on the surface of the water. The crew member reluctantly agreed, and approximately 3 cubic meters (approximately 792 gallons) of oily bilge water was then discharged directly into the ocean from the Clean Bilge Tank.

On or about October 14, 2022, when the *Star Maia* called at the Port of San Diego, California, Defendant Zeaborn and Defendant Parreno, knowingly failed to maintain an accurate Garbage Record Book, in violation of 33 U.S.C. § 1908(a), as the above-mentioned burning of garbage in barrels was not recorded in the Garbage Record Book. Additionally, Defendant Zeaborn and Defendant Estuye knowingly failed to maintain an accurate Oil Record Book, in violation of 33 U.S.C. § 1908(a), by maintaining an Oil Record Book that:

---

[2] While not especially difficult to operate, proper use of the pollution prevention equipment can be costly, time-consuming, and labor intensive. Additionally, based on information learned in past cases, it is not uncommon for engineers to prefer to keep the pollution prevention equipment in "pristine" condition, rather than performing the regular maintenance required to keep it running properly, and risking a mechanical malfunction occurring when the vessel is being inspected by port authorities.

(1) failed to record the discharges of oily bilge water from the Bilge Holding Tank and the Clean Bilge Tank into the ocean; and (2) falsely recorded that oily bilge water had been discharged using the Oil Water Separator when in fact that equipment had not been used. All in violation of Title 33, United States Code, Section 1908(a); and Title 33, Code of Federal Regulations, Sections 151.25 and 151.55.

Defendants Parreno and Estuye are sophisticated individuals who are capable of appreciating the negative impacts of their conduct. They are both college-educated and licensed mariners with years of practical experience in their field. They were both aware of their responsibilities under MARPOL, including record-keeping requirements and the prohibition on vessel garbage and oil discharges. Despite their advanced knowledge and experience, they affirmatively chose to disregard U.S. and international law and engage in illegal activities aboard the *Star Maia*.

Additionally, both Defendant Parreno and Defendant Estuye used their positions of authority as Master and as Chief Engineer to force subordinate crew members to discharge garbage and oil from the vessel. These orders required that the crew commit crimes; thus, Parreno's and Estuye's conduct exposed their subordinate crewmen to possible criminal prosecution. Considering Defendant Parreno's and Defendant Estuye's advanced knowledge and abuse of authority, their offenses of conviction are concerning. However, in mitigation and as discussed in greater detail below, both Defendants Parreno and Estuye quickly accepted full responsibility for their conduct and cooperated with the government in the investigation of Defendant Zeaborn and the third-party auditor.

B.   **The Need For The Sentence To Deter, Protect, And Provide Just Punishment**

Section 3553(a)(2) requires the court to consider the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the

7

public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Operational discharges of oil from vessels are one of the largest anthropogenic sources of petroleum oil pollution in the oceans.[3] It is estimated that the use or consumption of oil, including the intentional discharge of unfiltered oily bilge water, accounts for around 37 percent of worldwide ocean oil pollution.[4] By contrast, accidental spills from ships account for 12 percent of oil pollution.[5] As the National Academy of Sciences identified, the upshot of these statistics is that "[m]ore than 99 percent of the estimated volume of operational discharge is related to noncompliance, because existing regulations restrict operational discharges of oil or limit them to not more than 15 ppm."[6] Intentional oil discharges have a serious negative impact on the marine environment. "Marine mammal and bird species, which must regularly pass through the air-water interface to breathe, are particularly vulnerable to oil exposure."[7] Effects of oil on ocean life "may include ingestion of oil, accumulation of contaminants in tissues, DNA damage, impacts to immune functioning, cardiac dysfunction, mass mortality of eggs and larvae, *e.g.*, in fish, loss of

---

[3] *See* National Academy of Sciences, National Research Council, "Oil in the Sea III: Inputs, Fates, and Effects" (2003).
[4] *Id*. at 69.
[5] *Id*. *See also* Ian Urbina, "*Stowaways and Crimes Aboard a Scofflaw Ship*," The New York Times, July 17, 2015 ("Ships intentionally dump more engine oil and sludge into the oceans in the span of three years than that spilled in the Deepwater Horizon and Exxon Valdez accidents combined.").
[6] *Oil in the Sea III*, at 55.
[7] S.E. Chang et al., "Consequences of oil spills: a review and framework for informing planning," Ecology and Society, Vol. 19, No. 2 (2014). *Available at* https://ecologyandsociety.org/vol19/iss2/art26/

buoyancy and insulation for birds, and inhalation of vapors."[8] A 2002 study undertaken in Canada estimated that the intentional discharge of oil from ships kills approximately 300,000 seabirds per year in Atlantic Canada – "a yearly seabird mortality equal to that caused by the Exxon Valdez disaster in Alaska in 1989."[9]  The wider effects of oil pollution in the oceans are subtle but pernicious. For example, exposure to oil correlates to "strong and long-lasting population declines" in amphipod species, an important part of the marine food chain.[10] Likewise, "[f]loating oil can contaminate plankton," on which many fish and marine mammals directly or indirectly rely.[11]

Additionally, while it is well known that plastics in garbage can take hundreds of years to degrade, research is now showing that it is possible that plastics in the ocean never fully degrade, but instead become microplastics. Microplastics are tiny particles of plastic that can be eaten by marine animals and end up in their bodies and tissues, entering the food chain and leading to disastrous consequences for the health of our planet and its inhabitants. The presence of plastic in our ocean is continually increasing, and plastic pollution is one of the main causes of marine species extinction, health problems for human beings and animals, and the destruction of our ecosystems.[12]

---

[8] *Id*.
[9] *See* Francis Wiese, "*Seabirds and Atlantic Canada's Ship-Source Oil Pollution*," World Wildlife Fund Canada (2002).
[10] *See* Chang *et al*.
[11] *See* U.S. Fish & Wildlife Service, "*Effects of Oil on Wildlife and Habitat*," (June 2010).
[12] *See* Marta Fava, "Ocean Plastic Pollution, An Overview: Data and Statistics" Ocean Literacy Portal, UNESCO Intergovernmental Oceanographic Commission, available at https://oceanliteracy.unesco.org/plastic-pollution-ocean/

9

The task of protecting the world's oceans poses extraordinary challenges.[13] Combatting ocean pollution is a collective action problem[14] that requires the cooperation of many nations, including the United States, to succeed. MARPOL has been the international community's solution to this problem, and this treaty has been implemented in the United States by the Act to Prevent Pollution from Ships ("APPS"). The United States is a leader in compliance with and enforcement of MARPOL. Record-keeping requirements and inspections are not mere formalities; rather, they are the only viable means of enforcing this important international treaty. When lax companies and poorly trained and supervised employees dump garbage and oil into the ocean and attempt to subvert MARPOL and APPS, it seriously undermines the effectiveness of the federal and international ocean pollution prevention regimes.

The maritime and environmental regulatory system established in APPS and MARPOL is, in large part, a self-policing one. Even the least sophisticated vessel operators understand the long-established requirements of preventing pollution from ships, and it is incumbent upon the operators to properly handle garbage and oily bilge water, have operational pollution prevention equipment, and maintain proper records. USCG inspectors cannot be omnipresent and so they rely on the regulated industry to follow the law. This self-policing system breaks down when those responsible for ensuring these

---

[13] *See generally* Ian Urbina, "The Outlaw Ocean" (series), The New York Times, July 25, 2015, available at http://www.nytimes.com/interactive/2015/07/24/world/the-outlaw-ocean.html.

[14] *See* Elinor Ostrom, *Governing the Commons: The Evolution of Institutions for Collective Action* (1990) (analysis of governance of natural resources by Nobel-prize winning economist, including discussion of problem of mutual monitoring).

regulations are followed fail to do their job, or, worse yet, intentionally discharge garbage and oil and hide it from authorities.

## C. The Sentencing Guidelines

Defendants Zeaborn and Parreno have each pleaded guilty to one count of knowingly failing to maintain an accurate Garbage Record Book, while Defendants Zeaborn and Estuye have each pleaded guilty to one count of knowingly failing to maintain an accurate Oil Record Book, for the vessel *Star Maia*. Specifically, Defendants Zeaborn and Parreno maintained a Garbage Record Book that: (1) failed to record the burning of garbage in barrels on the vessel's deck; and (2) failed to record the disposal of burned garbage and barrels into the ocean, both in violation of Title 33, United States Code, Section 1908(a), and Title 33, Code of Federal Regulations, Section 151.55. Defendants Zeaborn and Estuye maintained and caused to be maintained an Oil Record Book that: (1) failed to record the discharges of oily bilge water from the Bilge Holding Tank and the Clean Bilge Tank into the ocean; and (2) erroneously recorded that oily bilge water had been discharged using the OWS when, in fact, the OWS had not been used, both in violation of Title 33, United States Code, Section 1908(a); Title 33, Code of Federal Regulations, Section 151.25; and Title 18, United States Code, Section 2.

*1. The Organizational Fine Calculations Do Not Apply to Environmental Offenses*

For the organizational defendant, the fine calculations for environmental offenses are specifically exempted from applicability by USSG § 8C2.l. The parties are jointly

recommending that Defendant Zeaborn pay a monetary penalty of $2,000,000, consisting of a criminal fine of $1,500,000, and a community service payment of $500,000. This community service payment shall be designated as organizational community service pursuant to 18 U.S.C. § 3563(b)(12) and § 8B1.3 of the United States Sentencing Guidelines and in furtherance of satisfying the sentencing principles provided for under 18 U.S.C. § 3553(a). Defendant will make the community service payment of $500,000 to the National Fish and Wildlife Foundation to fund projects related to the Tiajuana River. Additionally, the parties are jointly recommending a period of probation of 4 years, and the implementation of a comprehensive Environmental Compliance Plan (ECP) (included as Attachment A to the plea agreement), as well as a special assessment in the amount of $800.00 ($400.00 per count of conviction). The organizational defendant has agreed and stipulated that the fine amount is consistent with 18 U.S.C. § 3571 and that the fine has been properly calculated as representing twice the gain to Zeaborn. Additionally, although making side by side comparisons is difficult given that no two cases are identical, this penalty amount is consistent with other cases involving similar conduct and similarly-sized organizational defendants.

      The ECP is designed to prevent future violations by the corporate defendant. It requires Defendant Zeaborn to hire an independent auditor and monitor to report to the Probation Office and the government regarding compliance with the applicable laws, and insures proper training for all relevant employees during the period of probation. A monitor

is appropriate in this case because senior level ship officers were responsible for the violations and the violations were not appropriately addressed by shoreside employees and agents, indicating the need for improvements to the corporate culture of compliance.

   2.   *Defendant Alexander Parreno's Guideline Calculation*

For Defendant Parreno, the parties agree that the offense of Failing to Maintain an Accurate Garbage Record Book is covered by Section 2Q1.3, which provides for a Base Offense Level of 6, with an increase of 4 levels pursuant to Section 2Q1.3(b)(1)(B) because the offense otherwise involved a discharge of a pollutant. The Offense Level is then increased by 2 levels pursuant to Section 3B1.1, due to Defendant Parreno's role as an organizer, leader, manager, or supervisor. Section 3E1.1(a) provides for a reduction of 2 levels for the defendant's Acceptance of Responsibility, resulting in an Offense Level of 10. The parties agree that this is the appropriate advisory guideline calculation. Additionally, and as will be described in greater detail in the government's separate motion pursuant to § 5K1.1 of the Sentencing Guidelines, Defendant Parreno has provided substantial assistance in the investigation of the third-party auditor and in the investigation and prosecution of Defendant Zeaborn. The government therefore moves for a further reduction of 2 levels, resulting in an advisory guideline calculation Offense Level of 8.

The Offense Level of 8 and Criminal History Category I results in a guideline range of 0-6 months incarceration. The government recommends a sentence of 1 year of

unsupervised probation pursuant to 18 U.S.C. § 3561(c)(1), a fine in the amount of $2,000 pursuant to U.S.S.G. § 5E1.2(c)(3), and a $100 penalty assessment.

### 3. Defendant Constancio Estuye's Guideline Calculation

For Defendant Estuye, the parties agree that the offense of causing the Failure to Maintain an Accurate Oil Record Book is covered by Section 2Q1.3, which provides for a Base Offense Level of 6, with an increase of 4 levels pursuant to Section 2Q1.3(b)(1)(B) because the offense otherwise involved a discharge of a pollutant. The Offense Level is then increased by 2 levels pursuant to Section 3B1.1, due to Defendant Estuye's role as an organizer, leader, manager, or supervisor. Section 3E1.1(a) provides for a reduction of 2 levels for the defendant's Acceptance of Responsibility, resulting in an Offense Level of 10. The parties agree that this is the appropriate advisory guideline calculation. Additionally, and as will be described in greater detail in the government's separate motion pursuant to § 5K1.1 of the Sentencing Guidelines, Defendant Estuye has provided substantial assistance in the investigation of the third-party auditor and in the investigation and prosecution of Defendant Zeaborn. The government therefore moves for a further reduction of 2 levels, resulting in an advisory guideline calculation Offense Level of 8.

The Offense Level of 8 and Criminal History Category I results in a guideline range of 0-6 months incarceration. The government recommends a sentence of 1 year of unsupervised probation pursuant to 18 U.S.C. § 3561(c)(1), a fine in the amount of $2,000 pursuant to U.S.S.G. § 5E1.2(c)(3), and a $100 penalty assessment.

*4. Differentiating Parreno & Estuye from Other Vessel Pollution Defendants.*

Without excusing the offense conduct of either Defendant Parreno or Estuye, which is fully described above and in the Factual Basis sections of their respective Plea Agreements, the government wishes to highlight factors which it believes differentiates both of these defendants from many other defendants in vessel pollution cases.

As soon as this case was referred for investigation and prosecution, counsel for Defendant Parreno contacted the prosecutors to arrange for a proffer, explaining that his client was eager to accept responsibility and assist the government in its investigation and prosecution of the others involved. Despite being the senior-most person onboard, Defendant Parreno was the first member of the *Star Maia* crew to sit down with the prosecutors.[15] The information he provided not only saved the government time and effort in its investigation, but it directly led to the guilty plea of Defendant Zeaborn and the fine amount that the corporate defendant has agree to pay. Additionally, Defendant Parreno did not engage in any separate obstructive conduct that would justify an enhancement under the guidelines, which is something often found in these types of cases.

While not as quick as Defendant Parreno, Defendant Estuye nonetheless moved quickly to accept responsibility and meet with the government for a robust proffer. The

---

[15] The government typically starts these investigations by interviewing the most junior crew members first. However, the defense counsel initially hired by Defendant Zeaborn to represent the crew members significantly delayed scheduling the proffers. Once that defense counsel for the crew members was replaced by Defendant Zeaborn, the investigation proceeded much more quickly. However, in the meantime, Defendant Parreno and his defense counsel were the first to sit down with the government and proffer.

15

information he provided corroborated the information previously provided by Defendant Parreno, and was helpful in achieving the guilty plea of Defendant Zeaborn and the fine amount that the corporate defendant has agreed to pay. Additionally, like Defendant Parreno, above, Defendant Estuye did not engage in any separate obstructive conduct that would justify an enhancement under the guidelines, which is something often found in these types of cases.

By contrast, many (if not most) defendants in these types of cases wait for the government to fully complete its investigation before agreeing to proffer, if at all. Even then, those defendants are typically only willing to reluctantly admit to what they are certain the government can prove. Additionally, it is common in these cases for defendants to engage in separate obstructive conduct in an effort to frustrate any investigation into their pollution crimes. One recent example of this was the case of *United States v. Dennis Plasabas,* 3:22-cr-01802-JO (S.D.Ca. 2022), in which this Court sentenced the defendant to 12 months incarceration (ECF. Doc. 36). Unlike Defendants Parreno and Estuye (currently before this Court for sentencing), Defendant Plasabas refused to proffer with the government. Defendant Plasabas also went to great lengths to have clean seawater pumped through the pollution prevention equipment to create a false electronic record showing the system had been properly used when it had not. Additionally, when his vessel came into port in San Diego, California, Defendant Plasabas was interviewed by the U.S. Coast Guard, and he lied to them, denying any knowledge of or involvement with his illegal transfers and

discharges of oily bilge water into the ocean. Finally, in both his sentencing memorandum and in his statement to this Court at sentencing, Defendant Plasabas failed to accept responsibility for his crime, preferring instead to try to minimize his actions and blame others for what he had done.

The government respectfully submits that Defendants Parreno and Estuye are not similarly situated to Defendant Plasabas and many others who conducted themselves very differently in how they committed their vessel pollution crimes, tried to cover-up their vessel pollution crimes, chose not to cooperate with the government, and failed to accept responsibility for their actions.

## IV

## **CONCLUSION**

For all of the foregoing reasons, the government respectfully requests that the Court sentence Defendant Zeaborn to a period of probation of 4 years to include the full funding and implementation of the ECP included as Attachment A to the Plea Agreement as a special condition of probation, and order that the company pay: (1) a fine of $1,500,000, (2) an $800 penalty assessment, and (3) a community service payment in the amount of $500,000 to the National Fish and Wildlife Foundation. The government also respectfully requests that Defendant Parreno and Defendant Estuye each be sentenced to 1 year of unsupervised probation pursuant to 18 U.S.C. § 3561(c)(1), a fine in the amount of $2,000 pursuant to U.S.S.G. § 5E1.2(c)(3), and a $100 penalty assessment.

| | |
|---|---|
| Dated:  September 5, 2023. | Respectfully submitted<br><br>ANDREW HADEN,<br>Acting United States Attorney<br><br>s/ *Melanie K. Pierson*<br>MELANIE K. PIERSON<br>Assistant U.S. Attorney<br><br>TODD KIM<br>Assistant Attorney General<br>Environment & Natural Resources Division<br><br>s/ *Stephen Da Ponte*<br>STEPHEN DA PONTE<br>Senior Trial Attorney |